## STATE OF CONNECTICUT *v.* KENNETH GELORMINO, JR.
### (8438)

SPALLONE, LAVERY and LANDAU, Js.

Argued February 5—decision released May 7, 1991

*Vicki H. Hutchinson,* for the appellant (defendant).

*Judith Rossi,* assistant state's attorney, with whom, on the brief, were *Frank S. Maco,* state's attorney,

and *John Dropick,* assistant state's attorney, for the appellee (state).

SPALLONE, J. The defendant appeals from his conviction, rendered after a jury trial, of the crimes of burglary in the first degree in violation of General Statutes § 53a-101 (a) (2), and assault in the third degree in violation of General Statutes § 53a-61.[1]

On appeal, the defendant claims that the trial court improperly (1) failed to give his requested jury instruction that the state had the burden of disproving his claim of self-defense beyond a reasonable doubt, and (2) denied his motion for judgment of acquittal because there was insufficient evidence to sustain his conviction of burglary in the first degree. We hold that the trial court improperly refused to charge the jury that the state had the burden of disproving his claim of self-defense beyond a reasonable doubt and we reverse the conviction of burglary in the first degree and assault in the third degree.

The jury could have reasonably found the following facts. The victim, Gordon Vaill, was an acquaintance of the defendant, Kenneth Gelormino, Jr. Early in the evening of August 12, 1988, Vaill and his friend, Dominic Consolini, broke into the defendant's family business, Trim Unlimited, located in Torrington, and took a toolbox, which they hid in a nearby house, intending to sell it at a later time.

The next morning, neighbors told the defendant that they had seen two men loading a red box into a black pickup truck outside Trim Unlimited. The defendant discovered a broken window at the back of the shop

[1] The defendant has not appealed from his conviction of the crime of larceny in the fifth degree in violation of General Statutes § 53a-125a; thus, his conviction and sentence on that charge stands.

but did not report the break-in or the theft of the toolbox to the police.

That afternoon, the defendant's father, Kenneth Gelormino, Sr., himself a codefendant, suspecting Vaill's involvement, called Vaill's girl friend, Audrey McDonald, and asked her where he was staying. Upon her indication that Vaill was staying at Consolini's house, the defendant, his father and his brother William picked up McDonald at her home and drove her to Pulaski Street, where she pointed out Consolini's house. They parked nearby and engaged in a discussion as to who would have the best chance of gaining entry into Consolini's house. They agreed that William would go to the house and ask for Vaill.

They left McDonald at a restaurant and drove back to the Consolini house. William entered the house through a side door and told Vaill, who was sitting on a sofa in the living room, that he was there for a social visit.

At that point, the defendant and his father entered the house through the side door and William walked out. The defendant and his father asked Vaill, who was sitting down, for the toolbox and, when Vaill denied knowing anything about it, the father punched him in the head, rendering him stunned and dazed. The father continued beating Vaill with his fists and with a belt with metal rings, hitting his head, shoulders and back. Present during the altercation was Danielle Gordon, who was told by the father that Vaill was being beaten because he had taken something from them. Gordon then left the house and waited around the corner. The father continued to beat Vaill while the defendant searched the house. Thereafter, the defendant joined his father in the assault and commenced striking Vaill with a wooden two-by-four. During the assault, Vaill remained seated and attempted to shield his head with his hands.

After beating Vaill, the defendant and his father asked him who owned the television set that was in the room. Upon being told by Vaill that the set belonged to Consolini, the defendant stated, "It is mine now." He then picked up the television set and took it with him when he and his father left the house.

The victim was faint, dizzy and bleeding from multiple lacerations. A police officer, responding to a call, arrived at the house where he found the victim seated on the porch washing himself with a garden hose. The officer looked into the house through an open door and noticed blood on the floor. After obtaining a search warrant, the police entered Consolini's house where they found a bloodstained two-by-four, a bloodstained cane shaft and its detached handle. There were red stains on the back and arm of a love seat, on a cushion, on the stove top, on the kitchen floor and on a tabletop.

The victim was transported to the emergency room of Charlotte Hungerford Hospital where he was treated for multiple lacerations and abrasions to his head, face, arm and leg and for abdominal pain and shock. After it was determined that the victim was bleeding internally, emergency surgery was performed for a ruptured spleen, which was caused by blunt and severe trauma to the abdomen or back. The victim was hospitalized for ten days after surgery, including five days in intensive care. On August 27, he was readmitted for a second surgical procedure to relieve symptoms caused by adhesions that resulted from the splenic injury and the initial surgery.

The defendant, his father and brother were arrested as a result of the incident. The defendant was charged with assault in the first degree, General Statutes § 53a-59 (a) (1), burglary in the first degree, General Statutes § 53a-101 (a) (1) and (2), and larceny in the fifth degree, General Statutes § 53a-125a.

The defendant, his father and brother were tried jointly to a jury of six. Prior to submitting the case to the jury, the court granted the defendant's motion for judgment of acquittal on the charge of assault in the first degree because the evidence failed to support the allegation that the defendant caused serious physical injury with a dangerous weapon, and indicated that it would charge, instead, on assault in the second degree. The court subsequently deleted subsection (1) (armed with a dangerous instrument) from the burglary charge, and instructed the jury only on subsection (2) (intentionally inflicts or attempts to inflict bodily injury).

The jury convicted the defendant of assault in the second degree, burglary in the first degree and larceny in the fifth degree.[2] Thereafter, the defendant filed motions for judgment of acquittal on the assault and burglary counts. The court denied the motion with regard to the burglary count and reduced the conviction of assault in the second degree to the lesser included offense of assault in the third degree.

The trial court sentenced the defendant to one year on the third degree assault conviction, sixteen years on the first degree burglary conviction, execution suspended after five years, and six months on the fifth degree larceny conviction. The sentences of one year and of six months were to be served concurrently to each other but consecutive to the burglary sentence for a total effective sentence of sixteen years, suspended after six years with five years probation.

The defendant's first claim is that the trial court improperly refused to instruct the jury that the state had the burden of disproving his claim of self-defense beyond a reasonable doubt.

---

[2] At the end of the state's case the trial court granted William Gelormino's motion for judgment of acquittal on all counts. Kenneth Gelormino, Sr., was convicted and is appealing separately. *State* v. *Gelormino,* 24 Conn. App. 563, 590 A.2d 480 (1991).

The defendant testified at trial that upon his entry into the Consolini house and after he asked for the return of the toolbox, the victim pulled out a gun and held it to the defendant's head. He further testified that he was hit in the eye with the gun and that the victim declared, "I will blow your head off." The defendant asserted that he and the victim fought until the gun was dropped.

At the conclusion of all evidence, the defendant requested that the trial court include in its jury instruction the following: "Once any evidence has come into the case, on which reasonable doubt as to self-defense could be made, the state has the burden of proving beyond a reasonable doubt that the defendant's actions were not in self-defense." See *State* v. *Jenkins,* 158 Conn. 149, 154, 256 A.2d 223 (1969). The court failed to instruct the jury in accordance with the requested charge and, in fact, never specifically instructed the jury that it was the state's burden to disprove beyond a reasonable doubt that the defendant acted in self-defense.

Self-defense is raised by way of justification, and when such defense is asserted "the state shall have the burden of disproving such defense beyond a reasonable doubt." General Statutes § 53a-12 (a); *State* v. *Miller,* 186 Conn. 654, 661, 443 A.2d 906 (1982); *State* v. *Fletcher,* 10 Conn. App. 697, 707–708, 525 A.2d 535 (1987), aff'd, 207 Conn. 191, 540 A.2d 370 (1988); *State* v. *Folson,* 10 Conn. App. 643, 647, 525 A.2d 126 (1987); *State* v. *Fullard,* 5 Conn. App. 338, 340, 497 A.2d 1041 (1985). The evidence presented at trial supported the defendant's request for a self-defense charge. The defendant properly requested that the court charge the jury on self-defense and excepted to the court's failure to charge the jury on the state's burden to disprove the defense. He was entitled to have the jury properly

and adequately instructed on that theory of defense. *State* v. *Folson,* supra, 646.

The state argues that the charge when read as a whole was more than adequate to instruct the jury because throughout the charge the state's burden of proof was repeatedly declared to be beyond a reasonable doubt.

We reject, however, the notion that a general inclusion of an instruction anywhere in the charge as to the state's burden of proof beyond a reasonable doubt is sufficient to inform the jury as to the state's burden when disproving the defendant's due process assertion of a recognized specific defense. " 'A fundamental element of due process is the right of a defendant charged with a crime to establish a defense. . . . This fundamental constitutional right includes proper jury instructions on the elements of self-defense so that the jury may ascertain whether the state has met its burden of proving beyond a reasonable doubt that the assault was not justified.' *State* v. *Miller,* supra, 660–61; see also *State* v. *Rouleau,* 204 Conn. 240, 528 A.2d 343 (1987)." *State* v. *Holloway,* 11 Conn. App. 665, 671, 528 A.2d 1176 (1987).

The failure of the court specifically to instruct the jury on the state's burden of disproving the defense of self-defense to the charge of assault in the second degree deprived the jury of a thorough knowledge of the law that it could apply to the facts relevant to that charge.

In *State* v. *Holloway,* supra, 671–72, we stated that the lack of a full knowledge of the law regarding self-defense "precluded the jury from considering whether the state had proved beyond a reasonable doubt that the defense had been disproved." Without such knowledge, the jury was left to determine for itself who had the burden of disproving the defendant's assertion of

self-defense and, indeed, had to determine for itself the burden of proof required to refute such defense. A jury must receive a proper instruction on justification in order for it to determine whether the state has met its burden of proof. *State* v. *Fletcher,* supra, 708. It is impossible for the jury to make such a determination without the knowledge that the state has that burden.

Because the trial court did not properly charge the jury as to the state's burden to disprove the defense of self-defense beyond a reasonable doubt, we must set aside the defendant's conviction of assault in the third degree. Further, because the jury was instructed that the assault was the crime that the defendant intended to commit as an element of the offense of burglary in the first degree, the defendant's conviction of burglary in the first degree must also be set aside. Our disposition of the defendant's first claim is dispositive and we need not consider the defendant's second claim.

The judgment is reversed with respect to the defendant's convictions of the crimes of assault in the third degree and burglary in the first degree, and the case is remanded for a new trial on those charges.

In this opinion the other judges concurred.