## State of Connecticut *v.* Che Carter
### (14934)

## State of Connecticut *v.* Norman Dillon
### (14958)

Peters, C. J., and Callahan, Borden, Berdon and Norcott, Js.

Argued January 12—decision released April 4, 1995

*John R. Williams*, for the appellant in the first case (defendant Che Carter).

*Susan M. Hankins*, assistant public defender, for the appellant in the second case (defendant Norman Dillon).

*Carolyn K. Longstreth,* assistant state's attorney, with whom were *James Turcotte,* assistant state's attorney, and, on the brief, *Michael Dearington,* state's attorney, for the appellee in both cases (state).

NORCOTT, J. The sole issue in these certified appeals[1] is whether the Appellate Court properly concluded that the defendants were not entitled to a jury instruction on the law of self-defense. The defendants, Che Carter and Norman Dillon, were convicted,[2] after a joint jury trial, of murder in violation of General Statutes § 53a-54a (a).[3] The defendants' convictions were affirmed by the Appellate Court. *State* v. *Carter,* 34 Conn. App. 58, 640 A.2d 610 (1994); *State* v. *Dillon,* 34 Conn. App. 96, 640 A.2d 630 (1994). We granted certification to each of the defendants separately, limited to the issue of whether the trial court had improperly denied the defendants' written requests to instruct the jury on self-defense. *State* v. *Carter,* 229 Conn. 919, 644 A.2d 915 (1994); *State* v. *Dillon,* 230

---

[1] Because the defendants were tried together and both appeals involve the same issue, we resolve them together in one opinion. See *Kolich* v. *Shugrue,* 198 Conn. 322, 323 n.1, 502 A.2d 918 (1986); *Woodbury Water Co.* v. *Public Utilities Commission,* 174 Conn. 258, 259, 386 A.2d 232 (1978); *State* v. *Crowe,* 174 Conn. 129, 130–31, 384 A.2d 340 (1977); *State* v. *DiLorenzo,* 138 Conn. 281, 282, 83 A.2d 479 (1951).

[2] The defendants also were charged with conspiracy to commit murder in violation of General Statutes §§ 53a-54a (a) and 53a-48 (a), but they were acquitted of these charges.

[3] General Statutes § 53a-54a (a) provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

Conn. 906, 644 A.2d 920 (1994). We conclude that, under the circumstances of these cases, each of the defendants was entitled to a self-defense instruction. We therefore reverse their convictions and remand the cases for a new trial.

The pertinent facts are set forth in the Appellate Court opinion in the case of Che Carter as follows. "On December 28, 1989, at about 3 p.m., Willie Peterson, John Peterson and Wilbert Cannon were passengers in a gray Jeep Cherokee being operated by Paul Darden and owned by Darden's sister. The vehicle was traveling on Sylvan Avenue in New Haven. Cannon was armed with a Mac-11 gun,[4] while Willie Peterson was armed with a .380 handgun.[5] Darden stopped the vehicle at the corner of Asylum Street and Sylvan Avenue and John Peterson exited the car. He entered a corner store on the right side of the street and emerged approximately five minutes later. Cannon and Willie Peterson then exited the vehicle and began to walk up the left side of Asylum Street toward Davenport Street. Darden remained standing by the vehicle. Norman Dillon, Eric Bush, Paul Anderson, [Che Carter] and possibly one other person appeared in the middle of Asylum Street about fifteen feet from Cannon and Willie Peterson. Several members of that group had threatened Cannon and Willie Peterson in the past.

"Upon seeing the group, Willie Peterson and Cannon turned around and walked away. Gunshots rang out.[6] The group then consisted of only three or four

---

[4] "John Peterson testified that a Mac-11 is an Uzi. Cannon testified that the gun was an automatic weapon that holds thirty-six bullets." State v. Carter, supra, 34 Conn. App. 60 n.4.

[5] "John Peterson testified that a .380 is a type of automatic handgun. Cannon testified that the gun held nine bullets." State v. Carter, supra, 34 Conn. App. 60 n.5.

[6] "The prosecution elicited testimony that the first gunshots originated from the group of three or four. The defense elicited testimony from witnesses who did not know where the first gunshots originated." State v. Carter, supra, 34 Conn. App. 61 n.6.

people,[7] each of whom had a gun and was firing toward Cannon and Willie Peterson. The group firing at Willie Peterson and Cannon included the defendant[s] [Carter and Dillon]. Cannon turned around, pulled out his gun, fired about thirty shots toward the group and ran toward a field on the left side of the street while Willie Peterson ran toward John Peterson on the right side of the street.[8] John Peterson observed Willie Peterson grab his back and fall to the ground, landing on top of his gun, which was cocked and in firing position. [Carter], Dillon and Bush ran up Asylum Street toward Davenport Street. Four males were also seen running down Davenport Street after the shooting.

"Paul Halloran, an emergency medical technician employed by the New Haven fire department, arrived at the shooting scene approximately three minutes later. He observed a black male lying face down on the sidewalk of Asylum Street approximately two houses from the corner of Sylvan Avenue. The person did not appear to be breathing. He also observed a stainless steel gun lying a few feet away from the body, which he believed was a nine millimeter or .380 automatic, and several shell casings. Halloran assessed the victim's condition and found that the victim lacked vital signs. He then proceeded to remove the victim's clothes to initiate CPR. At that time, Halloran noticed that the victim had suffered a gunshot wound to the back rib cage area. The victim was transported by ambulance to the Yale-New Haven Hospital. The victim lacked vital signs upon arrival at the hospital, and was pronounced dead.

---

[7] "The testimony of Cannon indicated that one member of the group walked away before the shooting began." State v. Carter, supra, 34 Conn. App. 61 n.7.

[8] "There also was testimony that a white BMW was slowly backing down Asylum Street toward Sylvan Avenue. None of the witnesses, however, testified that any gunshots were fired from the car." State v. Carter, supra, 34 Conn. App. 61 n.8.

"The New Haven police conducted an investigation at the scene and discovered on Asylum Street thirty-four nine millimeter shell casings, one .380 shell casing and one shell casing of unknown caliber. In addition, the police extracted one live round from the .380 handgun lying next to the victim. Twenty-six nine millimeter shell casings were located on the left side of Asylum Street near the corner of Sylvan Avenue. These casings were found in the same area as the single .380 caliber casing. Eight nine millimeter shell casings were found on the left side of Asylum Street closer to Davenport Street. These nine millimeter casings were found in the same area as the five .45 caliber casings.

"The next day, from a photographic array, John Peterson identified [Carter and Dillon] as being at the scene of the shooting. On December 30, 1989, Cannon identified [Carter] as having been involved in the shooting of Willie Peterson.

"On December 29, 1989, H. Wayne Carver, chief medical examiner for the state of Connecticut, performed an autopsy on the victim. The autopsy revealed a gunshot wound in the back. It showed that the bullet entered the body at a forty-five degree angle from the left side and below the body, so that the trace of the bullet in the body followed an upward path from left to right, as if the victim was bending over when he was shot. The path of the bullet in the body also indicated that the shot was fired from behind the victim. The bullet followed a path through the eleventh rib, the lower half of the left lung, the sac around the heart, and passed by the right lung and lodged in the collar bone. It caused damage to the left lung, the upper chambers of the heart, the aorta, the pulmonary artery, the superior vena cava, bruised the right lung and partially fractured the clavicle. A .45 caliber bullet was removed from the victim's body during the autopsy. The state forensic laboratory determined that that bullet had not

been fired from Cannon's nine millimeter gun or from Willie Peterson's .380 caliber weapon. Although the autopsy revealed cocaine in the nose of the victim, it failed to reveal its presence in the victim's blood.

"On January 4, 1990, Detective Anthony Dilullo of the New Haven police department interviewed Maria Diaz about the shooting. Diaz identified [Carter and Dillon] as [two] of the persons involved. She also told Dilullo that Carter was on the left side of the street during the shooting.

"On October 6, 1990, Adam Luth, an Orange police officer, observed a green Saab on Route 1, Boston Post Road, in Orange. He noted that the vehicle displayed a rear marker plate, but lacked a front plate. Luth noted that there was a passenger in the car. The officer sought information about the vehicle from the department of motor vehicles. The department advised Luth that it had no information about the vehicle. The Saab pulled into a gas station on Boston Post Road and stopped. The officer approached the vehicle and asked the driver for his operator's license, registration and insurance card. The operator identified himself as Carlos Carter. The officer checked his name with the dispatcher and was informed that there possibly was a warrant for the operator's arrest. The officer then asked the passenger for identification. The passenger stated that he had no identification and that he was Harold Goldston. The officer then requested information from the dispatcher concerning Goldston. Luth returned to talk with the vehicle's operator, who was pumping gas. The officer asked the operator the name of the passenger and the operator told the officer that the passenger was his brother Che. The officer then asked the passenger to exit the vehicle and asked him for his real name. The passenger said that his name was Che Carter. The dispatcher informed the officer that the arrest warrant was for Che Carter. The New

Haven police department informed the Orange police that Che Carter had a round scar on the right forearm. The officer saw such a scar on the passenger's right forearm. The Orange police then detained [Carter] until the New Haven police arrived. Dilullo came to the Orange police department and positively identified [Carter] as the person wanted for murder. The detective then placed [Carter] under arrest." *State* v. *Carter*, supra, 34 Conn. App. 60–64; see also *State* v. *Dillon*, supra, 34 Conn. App. 98.

At trial, the defendants submitted written requests for a jury instruction on the issue of self-defense. The trial court rejected the defendants' requests on the dual grounds that the defendants had presented no evidence at trial to support such an instruction,[9] and that the requests were untimely because they did not comply with Practice Book § 853.[10] The Appellate Court

---

[9] The record reveals that Carter did not take exception to the trial court's failure to give a self-defense instruction. Practice Book § 852, however, provides that "[t]he supreme court shall not be bound to consider error as to . . . the failure to give . . . an instruction unless the matter is covered by a written request to charge *or* exception has been taken by the party appealing . . . ." (Emphasis added.) Because Carter submitted a written request to charge the jury on the issue of self-defense, his failure to take exception is of no consequence.

[10] Practice Book § 853 provides: "REQUESTS TO CHARGE ON SPECIFIC CLAIMS

"Written requests to charge the jury must be filed in triplicate with the clerk before the beginning of the arguments or at such earlier time during the trial as the court directs, and the clerk shall file them and forthwith hand one copy to the judicial authority and one to opposing counsel."

The Appellate Court declined to determine whether the trial court properly excluded the requested charge in light of the trial court's conclusion that the defendants' requests were untimely. *State* v. *Carter*, supra, 34 Conn. App. 64–65. Initially, we note that the state does not argue that the alleged untimeliness of the defendants' requests to charge on self-defense constitutes a valid alternative ground for affirming the decision of the Appellate Court. See, e.g., Practice Book § 4140 (c); *Quire* v. *Stamford*, 231 Conn. 370, 377 n.7, 650 A.2d 535 (1994). Moreover, it is clear that the court was apprised of the parties' concern regarding this instruction. Not only did the state file a timely request for the self-defense instruction, but the issue

affirmed the trial court's decision, concluding that "[o]n the basis of the evidence, a reasonable doubt in the mind of a rational juror that the defendant[s] acted in self-defense could not have been raised." *State* v. *Carter,* supra, 34 Conn. App. 68, citing *State* v. *Lewis,* 220 Conn. 602, 619, 600 A.2d 1330 (1991).

The defendants, on appeal, claim that the Appellate Court improperly upheld the trial court's failure to instruct the jury on the defense of self-defense.[11] They

was also addressed by all parties in closing arguments. Because the trial court was fully aware of the self-defense issue in advance of preparing its charge to the jury, we conclude, on the basis of this record, that the defendants' failure to make a timely request was not a valid reason for excluding the jury charge.

[11] Self-defense is defined in General Statutes § 53a-19, which provides: "USE OF PHYSICAL FORCE IN DEFENSE OF PERSON. (a) Except as provided in subsections (b) and (c) of this section, a person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm.

"(b) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using deadly physical force upon another person if he knows that he can avoid the necessity of using such force with complete safety (1) by retreating, except that the actor shall not be required to retreat if he is in his dwelling, as defined in section 53a-100, or place of work and was not the initial aggressor, or if he is a peace officer or a private person assisting such peace officer at his direction, and acting pursuant to section 53a-22, or (2) by surrendering possession of property to a person asserting a claim of right thereto, or (3) by complying with a demand that he abstain from performing an act which he is not obliged to perform.

"(c) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using physical force when (1) with intent to cause physical injury or death to another person, he provokes the use of physical force by such other person, or (2) he is the initial aggressor, except that his use of physical force upon another person under such circumstances is justifiable if he withdraws from the encounter and effectively communicates to such other person his intent to do so, but such other person notwithstanding continues or threatens the use of physical force, or (3) the physical force involved was the product of a combat by agreement not specifically authorized by law."

argue that because they had adduced sufficient evidence at trial to warrant a self-defense instruction, their federal constitutional rights to due process of law required that the jury be informed of the availability and the elements of self-defense. We agree.

" 'If the defendant asserts a recognized legal defense and the evidence indicates the availability of that defense, such a charge is obligatory and the defendant is entitled, as a matter of law, to a theory of defense instruction.' *State* v. *Fuller*, 199 Conn. 273, 278, 506 A.2d 556 (1986). The defendant's right to such an instruction is founded on the principles of due process. *Washington* v. *Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967); *State* v. *Miller*, 186 Conn. 654, 660–61, 443 A.2d 906 (1982); *State* v. *Rosado*, 178 Conn. 704, 707, 425 A.2d 108 (1979). Certainly, self-defense is a recognized legal defense. General Statutes § 53a-19; *State* v. *Miller*, supra, 661; *State* v. *Rosado*, supra, 708. Before an instruction is warranted, however, '[a] defendant bears the initial burden of producing sufficient evidence to inject self-defense into the case.' *State* v. *Bailey*, 209 Conn. 322, 335, 551 A.2d 1206 (1988). To meet that burden, the evidence adduced at trial, whether by the state or the defense, must be sufficient to raise a reasonable doubt in the mind of a rational juror as to whether the defendant acted in self-defense. *State* v. *Cassino*, 188 Conn. 237, 243, 449 A.2d 154 (1982); *State* v. *Folson*, 10 Conn. App. 643, 647, 525 A.2d 126 (1987). Only when the issue has been sufficiently raised does the state 'have the burden of disproving such defense beyond a reasonable doubt.' General Statutes § 53a-12 (a); *State* v. *Miller*, supra, 661; *State* v. *Gelormino*, 24 Conn. App. 556, 561, 590 A.2d 476, cert. denied, 219 Conn. 911, 593 A.2d 136 (1991)." *State* v. *Lewis*, supra, 220 Conn. 618–19.

In order sufficiently to raise self-defense, a defendant must introduce evidence that the defendant rea-

sonably believed his adversary's unlawful violence to be "imminent" or "immediate." W. LaFave & A. Scott, Handbook on Criminal Law (1972) § 53, p. 394. "Under General Statutes § 53a-19 (a), a person can, under appropriate circumstances, justifiably exercise repeated deadly force if he reasonably believes both that his attacker is using or about to use deadly force against him and that deadly force is necessary to repel such attack. *State* v. *Corchado*, 188 Conn. 653, 663, 453 A.2d 427 (1982). . . . The Connecticut test for the degree of force in self-defense is a subjective-objective one. The jury must view the situation from the perspective of the defendant. Section 53a-19 (a) requires, however, that the defendant's belief ultimately must be found to be reasonable." *State* v. *DeJesus*, 194 Conn. 376, 389 n.13, 481 A.2d 1277 (1984). Moreover, "[i]t is not the law . . . that the person who first uses physical force is necessarily the initial aggressor under § 53a-19 (c) (2)." *State* v. *Jimenez*, 228 Conn. 335, 340, 636 A.2d 782 (1994).

When we are called on to review a trial court's refusal to give a self-defense instruction, " 'we must adopt the version of the facts most favorable to the defendant which the evidence would reasonably support.' " *State* v. *Lewis*, supra, 220 Conn. 619, quoting *State* v. *Havican*, 213 Conn. 593, 595, 569 A.2d 1089 (1990). "[A] defendant is entitled to have instructions presented relating to any theory of defense for which there is any foundation in the evidence, no matter how weak or incredible . . . ." (Internal quotation marks omitted.) *State* v. *Fuller*, 199 Conn. 273, 278, 506 A.2d 556 (1986). The defendants argue that although the Appellate Court properly enunciated this standard of review, it improperly applied this standard to the facts of their cases. Specifically, the defendants contend that the Appellate Court adopted a version of the facts most favorable to sustaining the verdict, treating the defend-

ants' claim as one of sufficiency of the evidence, rather than adopting a version of the facts most favorable to the defendants.

Throughout the course of the trial, an underlying issue was what and who had precipitated the violent encounter. By all the witnesses' accounts, the scene that unfolded on the afternoon of December 28, 1989, near the intersection of Sylvan Avenue and Asylum Street, was tantamount to a "Wild West" shoot-out. Although neither defendant testified, the jury heard divergent testimony detailing the confrontation between the two armed, hostile groups that resulted in gunfire and the fatal shooting of Willie Peterson. Darden and Cannon, both members of the victim's group, stated that members of the defendants' group had begun the shooting melee.[12] John Peterson, also a member of the victim's group, testified that at some point he saw Cannon reach for his Uzi-like Mac-11 weapon.[13] Maria Diaz, the sole disinterested witness,

---

[12] Given that this often conflicting testimony came from two participants, both of whom were reluctant to testify, and who had an interest in the outcome, the jury rationally could have discounted this testimony. For example, many of these witnesses' statements were introduced by virtue of prior inconsistent statements made to the police or at earlier probable cause hearings. Indeed, in order to secure Darden's testimony, he had to be arrested, held as a material witness and brought to court against his will.

[13] John Peterson's testimony on cross-examination in this regard was as follows:

"[The State]: What did Wilbert Cannon do during this time? . . . During the time of the shooting.

"[The Witness]: He was running through a field when I seen him.

"Q. You said that you had seen him pull his gun?

"A. He was running through the field.

"Q. All right. But earlier today you said that you saw him pull his gun?

"A. Yes.

"Q. At what point did he pull his gun?

"A. I can't recall that, I don't know at what point in time when he pulled his gun, I know he was reaching. When I looked up and turned around, whatever happened, he was running through the field.

"Q. You said he was reaching. Did you indicate his waistband?

could not identify the instigator. In addition, the jury reasonably could have inferred[14] from the evidence that bad blood existed between the two groups[15] and that the victim's group had sought out the clash by driving around the neighborhood of the defendants' group[16] with semiautomatic weapons.[17] The jury also could have concluded that the two armed groups were engaged in a volatile confrontation and that members of both groups believed that they were in imminent danger and that immediate defensive action was necessary and justified.[18] Also, the evidence from the crime scene

"A. He was reaching.

"Q. He was reaching, was he reaching while on the sidewalk, while on the field, or what?

"A. He was reaching when he was on the sidewalk."

[14] In viewing evidence that could yield contrary inferences, "[t]he rule is that the jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Grant*, 219 Conn. 596, 604, 594 A.2d 459 (1991); see also *State* v. *Sauris*, 227 Conn. 389, 399–400, 631 A.2d 238 (1993).

[15] Evidence adduced at trial suggested that the defendants had threatened members of the victim's group. Cannon testified that Carter had stated, prior to this confrontation, that "he was going to get me." Later, Cannon added that Carter meant that he was going to get "all of you" (victim's group of friends). Cannon further testified that he perceived that his group was threatened by the presence of the defendants' group at the time of the shooting.

[16] According to Cannon's testimony, he, John Peterson, Darden and the victim drove around for approximately four hours before ending up at Sylvan Avenue and Asylum Street to buy candy and to look for an unidentified woman named "Rachel." In addition, Benjamin Evans testified that he had seen Darden and John Peterson riding around the neighborhood for forty-five minutes to one hour.

[17] At least two members of the victim's group, Cannon and the victim, were armed with semiautomatic weapons that were displayed in their waistbands.

[18] In light of Cannon's testimony that he was cognizant of Carter's threat against his group and that he was armed with a semiautomatic weapon when they confronted the defendants' group, a rational jury could have rejected Cannon's testimony that he turned his back on the group and walked away. Instead, the jury could have drawn the reasonable inference that Cannon and his group were the aggressors, and that the defendants justifiably retaliated.

demonstrated that both groups participated in the barrage of gunfire[19] and all of the witnesses testified that both sides retreated from the shooting.

Indeed, in recognition of the questions raised by the evidence presented at trial, the state and both defendants submitted written requests for a self-defense instruction and argued to the jury in summation concerning who was the initial aggressor. Moreover, the jury itself expressed concern as to the issue of self-defense by sending a note to the trial judge during deliberations asking whether the court had addressed the issue of self-defense in its charge, and if so, asking the court to repeat it.[20] We have recognized that a request by a jury may be a significant indicator of their concern about evidence and issues important to their resolution of the case. See *State* v. *Santiago*, 224 Conn. 325, 334, 618 A.2d 32 (1992); *State* v. *Moody*, 214 Conn. 616, 629, 573 A.2d 716 (1990).

Adopting the version of the facts most favorable to the defendants, we conclude that there was, if believed, evidence sufficient to have raised a reasonable doubt in the mind of a rational juror as to whether the defendants acted in self-defense. *State* v. *Lewis*, supra, 220 Conn. 619. The evidence was not of such a nature that the jury needed to resort to speculation that the defendants reasonably believed that they had to act in self-defense. See *State* v. *Belle*, 215 Conn. 257, 275, 576 A.2d 139 (1990). Consequently, the question of self-defense should have been one for the jury ultimately to consider and resolve. We conclude, therefore, that the defendants were entitled to a jury instruction on

[19] For example, Cannon fired in excess of thirty rounds and the victim was found with a .380 Bursa semiautomatic handgun, "cocked and in the firing position," and an expired shell from that gun next to his body.

[20] The second question of the bifurcated request from the jury is as follows: "Did you address the issue of self-defense, and if so, please repeat?"

self-defense, and that the trial court improperly refused to give such an instruction.

The judgments of the Appellate Court are reversed, and the cases are remanded to that court with direction that they be remanded to the trial court for a new trial.

In this opinion the other justices concurred.