STATE OF CONNECTICUT *v.* RONALD WALTON
(12608)

O'Connell, Spear and Hennessy, Js.

Argued February 20—officially released June 25, 1996

*Suzanne Zitser*, assistant public defender, for the appellant (defendant).

*Christopher T. Godialis*, deputy assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Rosita M. Creamer*, assistant state's attorney, for the appellee (state).

O'CONNELL, J. The defendant appeals from the judgment of conviction of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1), assault in the first degree in violation of General Statutes § 53a-59 (a) (1), and carrying a pistol without a permit in violation of General Statutes § 29-35. The defendant claims that the trial court improperly (1) denied his motion to suppress two statements, (2) excluded evidence of the victim's use of cocaine, (3) dismissed a regular juror after deliberations had begun, and (4) substituted an alternate juror for a regular juror after deliberations had begun. We reverse the judgment of conviction and remand for a new trial.

The jury could reasonably have found the following facts. On the evening of December 30, 1991, Melvin, Evelyn, and Tony Kardulis drove to a convenience store on the corner of Farmington Avenue and Marshall Street in Hartford to purchase laundry detergent. Evelyn waited in the car while Melvin went into the store. After

returning a video at a nearby store, Tony joined Melvin in the store.

A group of five men, including the defendant and Tarik Hightower, approached Melvin and Tony in the convenience store. The group then left and waited outside for Melvin and Tony. Outside, Hightower grabbed Melvin and forced him down on the pavement. Tony attempted to protect Melvin by kicking Hightower. The defendant, who up until this point had not been involved in the fight, pulled out a gun and fired at both Melvin and Tony. Tony attempted to disarm the defendant, who continued shooting. When he was out of bullets, the defendant fled and tossed the gun into a nearby dumpster. Melvin and Tony were taken by ambulance to a hospital where Melvin died from three gunshot wounds to his chest and neck. Additional facts are included in the analysis of individual claims.

I

The defendant first raises a two part challenge to the trial court's denial of his motion to suppress two incriminating statements that he gave without the benefit of *Miranda*[1] warnings. We conclude that the trial court properly denied the defendant's motion.

At the suppression hearing, the trial court found the following facts. On the morning following the shooting, the sixteen year old defendant, with his mother, sister, and grandfather, appeared at the Hartford police station at 9 a.m. The defendant's mother told the desk sergeant that she wanted to turn her son in for being "involved" in the previous evening's shooting. The desk sergeant escorted the defendant and his family to the second floor crimes against persons unit. The defendant was told to wait in an interview room, and his family was seated at a conference table about twenty-five feet

---

[1] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

away. The door to the interview room was left open, and, although there were officers on duty in the unit, the room itself was unguarded.

The desk sergeant telephoned Detective James Rovella, an investigator assigned to the shooting, stating that "a party . . . who had knowledge of" the shooting had come to the station. Upon arriving from his home forty-five minutes later, Rovella spoke with the defendant's family, and ascertained that the defendant was then wearing the same clothes that he had worn the previous evening. At no time did the family tell Rovella that the defendant was the shooter.

Rovella went to the interview room, shut the door and introduced himself. At that time, Rovella saw that the defendant's clothing and physical characteristics matched the description of the shooter that he had been given at the scene. Rovella did not apprise the defendant of his *Miranda* rights and asked the defendant what had happened on the previous night. In response to this single question, the defendant answered that an argument between two men escalated into a physical confrontation, and that he fired his gun to protect a friend from one of the men who was brandishing a knife.

Approximately five minutes after Rovella had entered the interview room, a woman introducing herself as the defendant's attorney knocked on the door. Rovella immediately ceased questioning the defendant and left the interview room. The defendant and his attorney spoke privately.

On the basis of his oral confession to the shooting, the defendant was arrested and transferred to Officer Thomas Kieselback for booking. During fingerprinting, the defendant became upset and began to cry. Kieselback asked the defendant "if he was all right." The defendant responded to this question by again confessing to the shooting.

## A

In the first part of this claim, the defendant argues that the trial court improperly denied his motion to suppress the incriminating statement made to Rovella.

Two conditions must be satisfied to trigger the advisement of rights constitutionally required by *Miranda*: (1) the suspect must be in the custody of law enforcement officials; and (2) the suspect must be subjected to interrogation.[2] *State* v. *Vitale*, 197 Conn. 396, 411, 497 A.2d 956 (1985).

Our review of a trial court's finding of whether a person was in custody has previously been limited to a determination of whether that finding is clearly erroneous. *State* v. *Ross*, 230 Conn. 183, 204, 646 A.2d 1318 (1994), cert. denied, 513 U.S. 1165, 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995); *State* v. *Northrop*, 213 Conn. 405, 414, 568 A.2d 439 (1990). The United States Supreme Court, however, has recently held that a federal habeas court's review of a state trial court's determination of custody for *Miranda* purposes is a mixed question of law and fact. *Thompson* v. *Keohane*, 516 U.S. 99, 112–13, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995). "Two discrete inquiries are essential to the determination [of custody]: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." Id., 112. The first inquiry, " 'whether there [was] a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest' "; *Stansbury* v. *California*, 511 U.S. 318, 322, 114 S. Ct. 1526, 128 L.

---

[2] The defendant correctly states that *Miranda* warnings have been held to have independent significance under our state constitution. *State* v. *Falby*, 187 Conn. 6, 11 n.1, 444 A.2d 213 (1982). Because this statement is the extent of his state constitutional analysis, however, we decline to address the defendant's claim under article first, § 8. See *State* v. *Joly*, 219 Conn. 234, 258 n.16, 593 A.2d 96 (1991).

Ed. 2d 293 (1994), quoting *California* v. *Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983) (per curiam); *State* v. *Pittman*, 209 Conn. 596, 606, 553 A.2d 155 (1989); is factual and will not be overturned unless it is clearly erroneous. See *State* v. *Ross*, supra, 204. The second inquiry, whether "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave"; *United States* v. *Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980); requires an "application of the controlling legal standard to the historical facts. This ultimate determination . . . presents a 'mixed question of law and fact' qualifying for independent review." *Thompson* v. *Keohane*, supra, 465. Because *Thompson* held that independent review of a trial court's determination of whether the defendant was in custody "insure[s] protection of the [fifth amendment] right against self-incrimination"; id., 467; we must apply this standard in our review of the defendant's claim.

In applying this standard for the first time in this state, we begin by addressing whether the trial court's finding that the police did not restrain the defendant's freedom of movement to the degree associated with a formal arrest is clearly erroneous. The defendant was not a suspect in the shooting when he appeared unexpectedly at the Hartford police station. The defendant was not specifically told that he could leave at any time, but was also not told he had to remain at the station. The defendant was not searched, handcuffed, or physically restrained. The defendant's family was within sight of the unguarded interrogation room. The door to the interrogation room remained open for forty-five minutes until Rovella arrived. On the basis of these facts, we conclude that the trial court's finding that the defendant did not suffer a restraint on his freedom of

movement to the degree associated with a formal arrest is not clearly erroneous.

We now turn to the trial court's evaluation of whether, given the circumstances surrounding the defendant's interrogation, a reasonable person would have felt free to leave. Because this analysis called for the trial court to apply the controlling legal standard to the historical facts, we give it "independent review." Id., 465. Although the defendant testified that he did not feel free to leave, the trial court concluded that a reasonable person placed in those same circumstances would have felt free to leave. Earlier in this analysis, we reviewed the circumstances surrounding the defendant's appearance at the police station and his subsequent interrogation. We conclude that the trial court properly applied the legal standard to the facts and concluded that the defendant was not in custody when he confessed to Rovella.

B

In the second part of this claim, the defendant asserts that the trial court improperly denied his motion to suppress his inculpatory statement to Kieselback.

We have already stated the well established principle that, in addition to being in custody, a defendant is not entitled to *Miranda* warnings unless he is also interrogated. *State* v. *Medina*, 227 Conn. 456, 462, 636 A.2d 351 (1993); *State* v. *Rosado*, 218 Conn. 239, 252, 588 A.2d 1066 (1991). The defendant bears the initial burden of showing that he was subjected to interrogation. See *State* v. *Medina*, supra, 463. Interrogation includes not only those questions that are explicitly designed to elicit an incriminating response, but also extends to any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from a suspect. *Rhode Island* v. *Innis*, 446 U.S. 291, 301–302, 100 S. Ct. 1682, 64 L.

Ed. 2d 297 (1980). The police, however, cannot be held accountable for the unforeseeable results of their words or actions. Id. Because Kieselback's conduct during booking was neither explicitly designed nor reasonably likely to provoke an incriminating response from the defendant, Kieselback's question and the defendant's resulting confession did not constitute an interrogation. We therefore conclude that the trial court properly found that the defendant was not interrogated by Kieselback.

II

The defendant next complains that the trial court abused its discretion by precluding him from eliciting testimony that Melvin Kardulis, the victim, had ingested cocaine prior to his death. The defendant argues that this testimony was relevant to his self-defense claim and that its preclusion deprived him of his constitutional rights to present a defense, to due process, and to a fair trial.[3]

In an offer of proof outside the presence of the jury, Edward McDonough, the state's deputy chief medical examiner, testified that he performed an autopsy on Melvin Kardulis. As part of that autopsy, McDonough took a blood sample and a nasal swab from the body. A preliminary screening test revealed the presence of cocaine or its breakdown products. Because a positive result was obtained from the preliminary screening, a more sensitive confirmatory test, that picks up only the parent compound of cocaine, was conducted. This test came back negative.

McDonough testified that a positive preliminary screening and a negative confirmatory test indicated

---

[3] Because the defendant has not separately analyzed his state constitutional claim under article first, § 8, we limit our analysis to the relevant federal constitutional claim. See State v. Joly, 219 Conn. 234, 258 n.16, 593 A.2d 96 (1991).

that: (1) "at some time" prior to Melvin's death, cocaine was present in his blood, and (2) at the time of his death, cocaine breakdown products were present in his blood. On the basis of the length of time it takes for cocaine to break down, McDonough estimated that the victim had ingested cocaine "many hours" before his death. McDonough further testified that he knew of no circumstances under which the inactive cocaine breakdown products present in Melvin Kardulis' blood at the time of his death would have any effect on his behavior.

"The trial court has broad discretion to determine the relevancy of evidence, and we will not disturb a trial court's ruling on the admissibility of evidence in the absence of a clear abuse of discretion." *State* v. *Suaris*, 227 Conn. 389, 407, 631 A.2d 238 (1993), citing *State* v. *Holliman*, 214 Conn. 38, 50, 570 A.2d 680 (1990). Relying on the offer of proof, the trial court (1) barred the defendant from eliciting testimony from McDonough that the preliminary screening tested positive for cocaine breakdown products, and (2) left open the possibility of the admission of the test results if they became relevant through another witness. We conclude that this ruling did not constitute an abuse of the trial court's discretion.

### III

The defendant next argues that the trial court improperly dismissed a regular juror without just cause after deliberations had begun.

After the trial court had instructed the jury and deliberations had begun, juror Helen Johnson privately told the court that she was too nervous to participate further in the deliberation process. After an inquiry of Johnson and a discussion with counsel, the court asked Johnson to continue, but suspended deliberations for the remainder of the day to allow Johnson to quiet her nervousness.

Before deliberations resumed the next morning, Johnson indicated that she "was not in the state of mind to be able to continue" and asked to be permanently excused. The court again inquired into Johnson's condition and asked if a suspension of deliberations until the following Monday would permit her to resume. Johnson agreed to return on Monday and again attempt to deliberate.

On the following Monday, Johnson telephoned the court, indicating that she would not be returning to deliberate. The trial court nonetheless ordered her to appear. After Johnson arrived and again refused to continue deliberating because of her nervous condition, the trial court excused her.

A court may excuse a regular juror if that juror, for any reason, becomes unable to perform his or her duty. General Statutes § 54-82h (c). The power to excuse a juror under this section is expressly premised on a finding of cause. *State* v. *Allen*, 216 Conn. 367, 378, 579 A.2d 1066 (1990). "Whether in the circumstances 'just cause' exists to excuse a juror is a matter within the discretion of the . . . court." *United States* v. *Casamento*, 887 F.2d 1141, 1187 (2d Cir. 1989).

The trial court conducted a thorough inquiry when Johnson first indicated that her nervous condition would preclude her from deliberating. The court twice suspended deliberations in an effort to allow Johnson to continue. Despite Johnson's unwillingness to proceed, the trial court made continued attempts to retain her on the jury. Only after Johnson's insistence that her nervous condition would not improve did the court finally excuse her. Ultimately, even defense counsel agreed that Johnson should be dismissed. We conclude that just cause existed to excuse Johnson and that the trial court did not abuse its discretion in dismissing her from the jury.

## IV

The defendant next argues that, even if the trial court properly excused Johnson, it improperly substituted a dismissed alternate juror for her after deliberations had begun.

## A

A defendant who is charged with an offense punishable by life imprisonment may not be tried by a jury of less than twelve without his consent. General Statutes § 54-82 (c); see also Practice Book § 841.[4] The defendant, charged with murder, refused to consent to a jury of eleven after Johnson's dismissal. In order to avoid a mistrial, the trial court substituted one of the alternate jurors in her place.

The defendant contends that the substitution of an alternate juror for a regular juror after deliberations had begun violates General Statutes § 54-82h (c). In support of this contention, the defendant relies on *State* v. *Williams*, 231 Conn. 235, 244, 645 A.2d 999 (1994). *Williams*, however, specifically declined to decide whether the substitution of an alternate juror for a regular juror after deliberations had begun violates § 54-82h (c) because the state conceded that such a substitution in that case violated the statute. Id., 242 n.10. The state in this case does not make the same concession and we, for the first time, must interpret the statute.

Section 54-82h (c) provides in part: "Alternate jurors shall attend at all times upon trial of the cause. . . . If,

---

[4] Practice Book § 841 provides: "The parties, after submission of the matter to the jury and prior to the verdict, may, by stipulation in writing and with the approval of the judicial authority, *elect to have the verdict rendered by a number of jurors fewer than that prescribed by law.* The judicial authority shall not permit such an election or stipulation unless the defendant, after being advised by the judicial authority of his right to a trial by a full jury, personally waives such right either in writing or in open court on the record." (Emphasis added.)

at any time, any juror shall, for any reason, become unable to further perform his duty, the court may excuse him and, if any juror is so excused or dies, the court may order that an alternate juror who is designated by lot to be drawn by the clerk shall become a part of the regular panel and the trial shall then proceed as though such juror had been a member of the regular panel from the time when it was begun. A juror who has been selected to serve as an alternate shall not be segregated from the regular panel except when the case is given to the regular panel for deliberation at which time he shall be dismissed from further service on said case."

The state argues that the plain language of the statute authorizes the trial court to substitute an alternate juror for a regular one "at any time," and does not preclude it from doing so once deliberations have begun. The state also argues that the language "at which time he shall be dismissed from further service" does not impose a prohibition against such substitutions once deliberations have begun. We do not agree.

Section 54-82h (c) specifically authorizes the trial court to excuse a regular juror "at any time" and to replace him with an alternate who has attended the trial "at all times." This section, however, also provides that alternates, who have not been selected to replace regular jurors at the time "the case is given to the regular panel for deliberation," are to "be dismissed from further service on said case."

In interpreting a statute, "we do not interpret some clauses in a manner that nullifies others, but rather read the statute as a whole and so as to reconcile all parts as far as possible. . . ." (Citations omitted; internal quotation marks omitted.) *West Haven* v. *Hartford Ins. Co.*, 221 Conn. 149, 157, 602 A.2d 988 (1992). Every word and phrase is presumed to have meaning, and we

do not construe statutes so as to render certain words and phrases surplusage. *Rydingsword* v. *Liberty Mutual Ins. Co.*, 224 Conn. 8, 16, 615 A.2d 1032 (1992).

If we construe the words "at all times" and "at any time" in this section to include the period following the submission of the case to the jury for deliberations, we are rendering the clause "at which time he shall be dismissed from further service on said case" meaningless. If, however, we consider the statute as a whole and interpret the words "at all times" and "at any time" to mean any time during which an undischarged alternate is still available for substitution because he has not been dismissed from further service on the case, then we have reconciled the statute's separate parts and rendered a "reasonable overall interpretation." *Broadley* v. *Board of Education*, 229 Conn. 1, 6, 639 A.2d 502 (1994). Accordingly, we conclude that a substitution of an alternate juror for a regular juror who has been excused once deliberations have begun violates § 54-82h.[5]

B

Even though we have concluded that substituting an alternate juror for a regular one once deliberations have begun is a per se violation of § 54-82h (c), this violation does not necessarily implicate the defendant's constitutional rights and a reversal of conviction is not automatic. Rather, the defendant bears the burden of proving that he was harmed by the substitution of the regular juror with an alternate. *State* v. *Williams*, supra,

---

[5] We recognize that our interpretation of this section will require trial courts to declare a mistrial if a juror must be excused during deliberations and the defendant does not consent to be tried by less than the number provided by law. We must interpret a statute, however, "without reference to whether we feel that it might be improved by adding to it or interpreting it differently. . . . It is our duty to apply the law, not to make it." (Citation omitted.) *Commissioner of Administrative Services* v. *Gerace*, 40 Conn. App. 829, 833, 673 A.2d 1172 (1996).

231 Conn. 244. We conclude that the defendant has not sustained this burden.

After excusing the regular juror, the trial court asked the remaining eleven jurors if they felt they could recommence deliberations if an alternate juror was placed on the panel. Satisfied that the remaining jurors could begin deliberations anew, the court questioned each of the discharged alternates individually as to whether he or she had: (1) discussed the case since being discharged; (2) seen any publicity about the case; (3) formed any conclusions or opinions about the defendant's guilt; or (4) knew of any reason why he or she could not participate fairly and impartially in the deliberations. Finding both alternates to be suitable replacements for the regular juror, the trial court, in accordance with § 54-82h (c), randomly chose one to serve on the panel. Once the alternate was impaneled, the trial court ordered the jury to begin deliberations anew.

The trial court in this case is to be commended for its attempts to prevent prejudice to the defendant and to protect the integrity of the trial in connection with the substitution of the alternate juror. Our examination of the record reflects that, when faced with the decision of declaring a mistrial or making the substitution, the trial court made significant efforts to minimize possible prejudice resulting from the substitution of the alternate juror. We thus conclude that the defendant has not sustained his burden of proving that he was harmed by the substitution of the alternate juror.

C

Despite our conclusion that the defendant was not harmed by the substitution, we must now address whether the substitution in the present case violated the defendant's right to due process of law.

In its initial instructions to the regular panel and alternate jurors, the trial court improperly instructed on the reasonableness of the defendant's degree of force used in self-defense. In so doing, the trial court replaced the proper subjective-objective standard with a purely objective one: "[R]easonable force is that force which an average person of ordinary intelligence in like circumstances would judge to be necessary to prevent injury and no more." The standard for determining the reasonableness of the degree of force used in self-defense in Connecticut is a subjective-objective one. *State* v. *Carter*, 232 Conn. 537, 545–46, 656 A.2d 657 (1995). The jury must first evaluate the defendant's "subjective belief as to the amount of force necessary . . . ." *State* v. *Prioleau*, 235 Conn. 274, 285, 664 A.2d 743 (1995). The jury must ultimately find, however, that the defendant's subjective belief is objectively reasonable. *State* v. *Hall*, 213 Conn. 579, 586 n.7, 569 A.2d 534 (1990); *State* v. *DeJesus*, 194 Conn. 376, 389 n.13, 481 A.2d 1277 (1984).

In response to the exceptions taken by counsel, the court recalled the jury and clearly instructed it that the appropriate standard by which to measure the reasonableness of the defendant's force was a subjective-objective one.[6] The alternate jurors, however, had been dismissed following the initial instructions and did not receive the corrected self-defense instruction. The trial court did not give the alternate juror the corrected instruction after impaneling him.

---

[6] The trial court properly reinstructed as follows: "I want to emphasize and make clear [that] the danger against which the defendant used force *is to be determined from his standpoint at the time of the incident,* and under all the surrounding circumstances. *You must view the situation from the defendant's perspective—it's a subjective test*—in assessing the risk which the defendant perceived he was facing. And that, then, *is to be judged objectively by*—judged ultimately against the acts of a reasonably prudent person, *instead of what I said about a person of average ordinary*—instead of a person of—average person of ordinary intelligence. It should be judged ultimately against that of a reasonably prudent person." (Emphasis added.)

A defendant's claim of an improper self-defense instruction is of constitutional dimension, and the standard of review to be applied to such a claim is whether it is reasonably possible that the jury was misled. *State* v. *Prioleau*, supra, 235 Conn. 284. The state contends that it is not possible that the jury was misled by the trial court's failure to repeat the curative instruction to the alternate because the original instructions on self-defense, when taken as a whole, adequately guided the jury to a proper verdict. We do not agree.

In determining whether the jury was misled by an improper self-defense instruction, it is well established that the charge is not to be critically dissected, but is to be considered as a whole from the standpoint of its effect on the jury in guiding it to a proper verdict. *State* v. *Ash*, 231 Conn. 484, 493–94, 651 A.2d 247 (1994). Having considered the original instructions as a whole, we conclude that the improper self-defense instruction, if not corrected, would have misled the jury into evaluating the reasonableness of the defendant's degree of force by a purely objective standard because the jury was not sufficiently apprised that the test for self-defense had both subjective and objective components.

The state points to numerous instances in the original instructions in which the court properly defined the word reasonable in conjunction with the defendant's belief that he was faced with the imminent use of physical force. The state contends that the proper definition of the word reasonable in this phrase adequately apprised the jury that it was to evaluate the reasonableness of the defendant's degree of force by the same standard. Reasonable belief and reasonable degree of force are distinct components within the self-defense statute, which are defined separately in the court's instructions. The jury is presumed to follow these instructions. *State* v. *Ortiz*, 217 Conn. 648, 669, 588 A.2d 127 (1991). We therefore cannot conclude that the jury

would have replaced the incorrect definition of reasonable as defined in conjuction with the defendant's degree of force with the correct one as defined in conjunction with imminent harm.

Because the jury was originally instructed that the defendant's reasonable belief of imminent danger is a subjective determination, and that the defendant's reasonable amount of force used is an objective one, we conclude that the original instructions misled the jury in its evaluation of the defendant's use of force. Without the benefit of the corrected instruction, it is reasonably possible that the alternate juror rejected the defendant's self-defense claim solely on what an "average person of ordinary intelligence" would have believed. Therefore, because the regular jurors and the alternate juror received conflicting instructions on the reasonableness of the degree of force used in self-defense, the defendant has demonstrated that it is reasonably possible that at least one juror was misled.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.