## STATE OF CONNECTICUT v. TYSON MURRAY
### (SC 16236)

McDonald, C. J., and Borden, Norcott, Katz, Palmer, Sullivan and Vertefeuille, Js.[1]

---

[1] This appeal originally was heard by a panel consisting of Chief Justice McDonald and Justices Borden, Katz, Sullivan and Vertefeuille. Thereafter, the court, pursuant to Practice Book § 70-7 (b), sua sponte, ordered that the case be considered en banc. Justices Norcott and Palmer were added to the panel, and they have read the record, briefs and transcript of the original oral argument.

(*Two justices dissenting in one opinion*)

Argued April 19—officially released September 5, 2000

*Kent Drager*, senior assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Warren Maxwell*, senior assistant state's attorney, for the appellee (state).

*Opinion*

KATZ, J. The dispositive issues in this appeal are whether: (1) the trial court violated General Statutes § 54-82h (c)[2] when it substituted an alternate juror for a regular juror after deliberations had begun; and (2) such violation is subject to harmless error analysis. We

[2] General Statutes § 54-82h provides: "Alternate jurors in criminal cases. Peremptory challenges. (a) In any criminal prosecution to be tried to the jury in the Superior Court if it appears to the court that the trial is likely to be protracted, the court may, in its discretion, direct that, after a jury has been selected, two or more additional jurors shall be added to the jury panel, to be known as 'alternate jurors'. Such alternate jurors shall have the same qualifications and be selected and subject to examination and challenge in the same manner and to the same extent as the jurors constituting the regular panel, provided, in any case when the court directs the selection of alternate jurors, the number of peremptory challenges allowed shall be as follows: In any criminal prosecution the state and the accused may each peremptorily challenge thirty jurors if the offense for which the accused is arraigned is punishable by death, eighteen jurors if the offense is punishable by life imprisonment, eight jurors if the offense is punishable by imprisonment for more than one year and for less than life, and four jurors in any other case.

"(b) Alternate jurors shall be sworn separately from those constituting the regular panel, and the oaths to be administered shall be as provided in section 1-25.

"(c) Alternate jurors shall attend at all times upon trial of the cause. They shall be seated when the case is on trial with or near the jurors constituting the regular panel, with equal opportunity to see and hear all matters adduced in the trial of the case. If, at any time, any juror shall, for any reason, become unable to further perform his duty, the court may excuse him and, if any juror is so excused or dies, the court may order that an alternate juror who is designated by lot to be drawn by the clerk shall become a part of the regular panel and the trial shall then proceed as though such juror had been a member of the regular panel from the time when it was begun. A juror who has been selected to serve as an alternate shall not be segregated from the regular panel except when the case is given to the regular panel for deliberation at which time he shall be dismissed from further service on said case."

conclude that the mid-deliberation substitution of an alternate juror violates § 54-82h (c), and that harmless error analysis does not apply.

Following a jury trial, the defendant, Tyson Murray, was convicted of attempted murder in violation of General Statutes §§ 53a-49 (a) (2) and 53a-54a,[3] and assault

---

[3] General Statutes § 53a-49 provides in relevant part: "Criminal attempt: Sufficiency of conduct; renunciation as defense. (a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

"(b) Conduct shall not be held to constitute a substantial step under subdivision (2) of subsection (a) of this section unless it is strongly corroborative of the actor's criminal purpose. Without negating the sufficiency of other conduct, the following, if strongly corroborative of the actor's criminal purpose, shall not be held insufficient as a matter of law: (1) Lying in wait, searching for or following the contemplated victim of the crime; (2) enticing or seeking to entice the contemplated victim of the crime to go to the place contemplated for its commission; (3) reconnoitering the place contemplated for the commission of the crime; (4) unlawful entry of a structure, vehicle or enclosure in which it is contemplated that the crime will be committed; (5) possession of materials to be employed in the commission of the crime, which are specially designed for such unlawful use or which can serve no lawful purpose of the actor under the circumstances; (6) possession, collection or fabrication of materials to be employed in the commission of the crime, at or near the place contemplated for its commission, where such possession, collection or fabrication serves no lawful purpose of the actor under the circumstances; (7) soliciting an innocent agent to engage in conduct constituting an element of the crime. . . ."

General Statutes § 53a-54a provides in relevant part: "Murder (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime. . . ."

in the first degree in violation of General Statutes § 53a-59 (a) (5).[4] The trial court rendered judgment in accordance with the jury verdict and imposed a total effective sentence of twenty years imprisonment, suspended after fifteen years, and five years probation. This appeal followed.[5]

On appeal, the defendant claims that: (1) the trial court improperly substituted an alternate juror for a regular juror after deliberations had begun in violation of § 54-82h (c); (2) the trial court improperly failed to declare a mistrial after one juror, prior to being excused by the court, made certain remarks to the other jurors; (3) the trial court abused its discretion when it admitted testimony from a police officer concerning his investigative efforts; (4) the trial court abused its discretion when, under the rule adopted in *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), it admitted a prior written statement that a state's witness had made to the police; and (5) the state failed to present sufficient evidence that the defendant had intended to kill the victim when he fired a shotgun at him, and that, in the alternative, if the evidence was sufficient to support his conviction for attempted murder, there was insufficient evidence that the defendant simultaneously had intended to cause physical injury short of death when he fired the shotgun.

We reject the defendant's claims regarding the insufficiency of the evidence of his mental state. We agree,

---

[4] General Statutes § 53a-59 provides in relevant part: "Assault in the first degree: Class B felony: Nonsuspendable sentences. (a) A person is guilty of assault in the first degree when . . . (5) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of the discharge of a firearm. . . ."

[5] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1, and General Statutes § 51-199 (c).

however, with the defendant's claims that the trial court impermissibly allowed the substitution of an alternate juror during deliberations and that such substitution requires a new trial. Accordingly, we reverse the judgment of conviction and order a new trial. Because of our disposition of this issue, we need not address the defendant's remaining claims.

The jury reasonably could have found the following facts. On May 4, 1996, Tyrell Boyd was riding in a motor vehicle driven by his friend Daniel Henry. At approximately 6:30 p.m., Henry parked his vehicle on Bedford Street, near the intersection of Bedford and Albany Avenue in Hartford, so that he could purchase cigarettes. When Henry came out of the store, he got into a heated conversation with someone he knew as "Lucius." When Lucius turned toward Boyd and asked him what he was looking at, Boyd got out of the vehicle and a fight began. A crowd of a dozen or more persons gathered around, and someone gave Lucius a baseball bat, which he proceeded to use to chase Boyd around Henry's car. As Boyd attempted to avoid Lucius by keeping Henry's car between them, he saw the defendant raise a shotgun and, from a distance of ten to twelve feet, fire it at him, striking Boyd's left upper thigh. Boyd stumbled into the car and Henry proceeded to drive him to St. Francis Hospital. When they arrived at the hospital, Boyd was bleeding profusely and had no blood pressure. The shotgun blast had blown away skin, muscle and tissue, had destroyed a major vein in Boyd's leg and had torn open a ten centimeter section of his femoral artery. Boyd required immediate surgery and a vein from his right leg had to be harvested for use in his left leg. Boyd received ten units of blood and other blood products during the operation. He was placed in the intensive care unit, and, after four additional surgeries, was released. Thereafter, his wounds

created a substantial risk of death and a serious impairment to his health.

Following his release from the hospital, Boyd, who knew the defendant prior to the shooting, selected the defendant's photograph from an array of eight photographs shown to him by the police. He was positive of his identification. Approximately six months before trial, Boyd saw the defendant on the street, at which time the defendant offered to pay him not to appear in court. Additional facts will be provided as needed.

## I

Because the defendant's challenge to the sufficiency of evidence, if successful, would necessitate the entry of a judgment of acquittal; *State* v. *Wolff*, 37 Conn. App. 500, 507, 657 A.2d 650 (1995), rev'd on other grounds, 237 Conn. 633, 678 A.2d 1369 (1996); we address this claim first. In the present case, the defendant claims that there was insufficient evidence to support his conviction for attempted murder. In particular, he asserts that the evidence does not support a finding that, when he shot the victim, he bore a specific intent to kill rather than a specific intent to cause physical injury short of death. In the alternative, the defendant asserts that there was insufficient evidence to support his conviction for first degree assault. Specifically, he contends that if we conclude that the evidence supported the conclusion that, in firing a single gunshot, the defendant had intended to kill the victim, that same evidence could not also establish that he had acted with the specific intent to cause physical injury short of death, an essential element of the first degree assault charge.

We first articulate the standard of review applicable to this claim. "In reviewing a sufficiency [of the evidence] claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether

upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Greenfield*, 228 Conn. 62, 76, 634 A.2d 879 (1993).

We next define the essential element that is involved in this appeal and that is integral to the crimes of which the defendant stands convicted. Although §§ 53a-54a and 53a-59 (a) (5) require the same mental state, namely, a specific intent; see *State* v. *Hinton*, 227 Conn. 301, 318–19, 630 A.2d 593 (1993); the particular specific intents required to violate these statutes are not identical. For each intent, a distinct conscious objective is sought. A verdict of guilty of attempted murder requires a finding of the specific intent to cause death. See General Statutes §§ 53a-49, 53a-54a and 53a-3 (11). A verdict of guilty of assault in the first degree in violation of § 53a-59 (a) (5), in contrast, requires a finding of the specific intent to cause physical injury. See General Statutes §§ 53a-59 (a) (5) and 53a-3 (3); see also *State* v. *Williams*, 237 Conn. 748, 753–54, 679 A.2d 920 (1996) (discussing §§ 53a-54a and 53a-59 [a] [1]).

A

With this background in mind, we embark upon our analysis, beginning with the more serious charge. The specific intent to kill is an essential element of the crime of murder. "To act intentionally, the defendant must have had the conscious objective to cause the death of the victim. General Statutes § 53a-3 (11) . . . ." (Internal quotation marks omitted.) *State* v. *Raguseo*, 225 Conn. 114, 120, 622 A.2d 519 (1993). Because direct evidence of the accused's state of mind is rarely available, intent is generally proven by circumstantial evidence. Therefore, intent is often inferred from conduct, as well as from the cumulative effect of the circumstan-

tial evidence and the rational inferences drawn therefrom. Id., 119. For example, "[i]ntent to cause death may be inferred from the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death." (Internal quotation marks omitted.) *State v. Sivri*, 231 Conn. 115, 127, 646 A.2d 169 (1994). This does not "require that each subordinate conclusion established by or inferred from evidence, or even from other inferences, be proved beyond a reasonable doubt [because this court has] held that a jury's factual inferences that support a guilty verdict need only be reasonable." *State v. Crafts*, 226 Conn. 237, 244, 627 A.2d 877 (1993). Nevertheless, because intent to cause the death of a person is an element of the crime; *State v. Raguseo*, supra, 120; that intent must be proven beyond a reasonable doubt.

The defendant claims that the evidence that he had fired a shotgun *only once* into Boyd's upper thigh, from a distance of ten to twelve feet, does not support a finding that he had the specific intent to kill because the upper thigh is not a vital portion of the body. The state contends that, because there is no direct evidence that the defendant deliberately targeted Boyd's upper thigh, the jury reasonably might have concluded that he was simply a poor shooter who had actually targeted Boyd's torso generally. The state also argues that, even if the defendant had targeted Boyd's thigh, the jury reasonably could have concluded that he had the intent to kill. We agree with the state that regardless of whether the thigh was the defendant's target when he fired the shotgun, the jury's finding of intent to kill was well founded.

The only direct evidence of the defendant's intended target came from Boyd, who testified that the defendant had "raised the rifle and shot me" from a distance of approximately ten feet, and from Henry's written state-

ment that he had seen the defendant fire one gunshot at Boyd. The defendant focuses on the fact that he shot Boyd only once. The defendant's failure to follow up by shooting Boyd again at closer range does not, however, necessitate a finding that the defendant did *not* intend to kill. See *State* v. *Hinton*, supra, 227 Conn. 305 (single shot from shotgun loaded with buckshot deadly enough to kill three people). At trial, the destructive nature of a shotgun was recounted by Louis Rodriguez, a Hartford police officer, who described the weapon's capacity to fire numerous projectiles at the same time that spread out as they travel. The farther the shooter is from the target, the wider the spread of the projectiles. Additionally, the nature of Boyd's very severe wound, including vein destruction and tissue damage, was described at trial by his physician. This evidence clearly supported a reasonable inference that the defendant had used a shotgun capable of firing several projectiles at Boyd with the intent to kill him. The deliberate firing of a shotgun capable of inflicting such massive damage, even if fired only once, is, under the facts of this case, essentially no different than firing another type of weapon several times in succession, and thus supports the jury's conclusion that the defendant intended to kill Boyd.

B

In *State* v. *Montanez*, 219 Conn. 16, 21, 592 A.2d 149 (1991), we concluded that, although the evidence in that case permitted the inference that the defendant had intended only to injure the victim, "[it] did not preclude the equally permissible inference that the defendant [had] intended to kill the victim . . . ." The converse is equally true. As we have determined previously, under some circumstances, the intent to cause death and the intent to cause serious physical injury may be possessed simultaneously.

"In *State* v. *Hinton*, [supra, 227 Conn. 305,] the defendant fired a single shotgun blast into a group of men, killing three and injuring another. Addressing the defendant's claim that the trial court improperly accepted inconsistent verdicts of guilty on counts of attempted murder and assault in the first degree, we concluded that '[i]t is clear that an assault in violation of § 53a-59 (a) (1) and (2) would be consistent with an attempted murder count in violation of §§ 53a-49 and 53a-54a if [the actual victim] were the defendant's intended victim, because those statutory sections require intentional conduct.' Id., 318–19. Because the counts of attempted murder and intentional assault had been premised on a single act of violence, our approval of verdicts of guilty for both offenses with respect to the same victim and the same act necessarily acknowledged that a defendant may simultaneously possess the intent to cause death and the intent to cause serious physical injury." *State* v. *Williams*, supra, 237 Conn. 753–54.

The defendant acknowledges that it is legally possible for a person to act both with an intent to kill and an intent to injure, but argues that the evidence in this case failed to prove that he "actually acted with this complex mental state." The state makes two arguments in response. First, the state contends that the intent to kill necessarily encompasses the intent to injure. Second, the state argues that, even if the convictions of attempted murder and of assault require proof that the defendant simultaneously harbored independent intents to injure and to kill Boyd, such proof was provided to the jury. We are persuaded by the state's arguments.

First, physical injury is defined as "impairment of physical condition or pain . . . ." General Statutes § 53a-3 (3). It is difficult to imagine how the intent to cause death does not encompass an intent to injure when death is the ultimate impairment of one's physical

condition. Therefore, one cannot intend to cause death without necessarily intending to cause a physical injury. See *State* v. *Rodriguez*, 180 Conn. 382, 403–405, 429 A.2d 919 (1980) (intent to cause death required for § 53a-54a includes intent to cause serious physical injury required for General Statutes § 53a-55 [a] [1]).

Second, even if we were to assume that the convictions of attempted murder and assault require proof that the defendant simultaneously harbored independent intents to injure and to kill Boyd, such evidence was established. It was entirely reasonable, under the facts of this case, for the jury to have found that the defendant intended to inflict physical injury to Boyd while also intending to cause his death. A defendant " 'can intend both to cause the victim a . . . physical injury and to kill the victim. No temporal separation is required for the intent, but obviously one is required for the result. A possible factual scenario would have a defendant intending to kill a person but first causing serious physical injury or disfigurement, so as to make the victim suffer before dying. The intent is simultaneous, as the conscious objective to cause the requisite results is simultaneous, while the results themselves are separated by time.' " *State* v. *Williams*, supra, 237 Conn. 755, quoting *State* v. *Williams*, 39 Conn. App. 18, 26, 663 A.2d 436 (1995) (*Foti, J.*, dissenting). In this case, the jury reasonably could have inferred from the defendant's conduct of firing the shotgun from ten to twelve feet away, thereby creating a substantial risk of death and serious impairment of Boyd's health, that he had possessed the intent, simultaneously, both to cause Boyd's death and to cause him physical injury during the process.

## II

We next address the dispositive issue in this appeal, namely, whether General Statutes § 54-82h (c) (Rev. to

1999) allows the substitution of an alternate juror once deliberations have commenced, and if not, whether such an improper substitution requires reversal. We conclude that, pursuant to § 54-82h (c), alternate jurors must be dismissed when the case is submitted for deliberation to the jury, and therefore, they cannot be substituted for regular jurors thereafter. We also conclude that harmless error analysis is inappropriate for such an impropriety.

The following additional facts are pertinent to this issue. On Thursday, June 11, 1998, after the jury had been given its final instructions by the trial court, the jurors retired to the jury room to deliberate and the alternate jurors were sent home.[6] The jury deliberated for the balance of the day without reaching a verdict. When proceedings resumed on Monday, June 15, 1998, after a three day hiatus, the trial court announced that the clerk had received a letter that morning from one of the jurors (juror M). In the letter, juror M expressed her concern continuing her service. Specifically, she stated that she was afraid she "might run into one of the parties involved in the case one day," that she had seen "the defendant and his friends outside of the courthouse," and that she was afraid of being followed. The trial court disclosed the letter to the counsel for the state and the defendant, both of whom agreed that juror M should be excused.

Juror M was called into the courtroom for a brief voir dire examination so that the court could ascertain whether she had communicated her concerns to her fellow jurors.[7] The trial court then considered its

---

[6] When the alternate jurors and the regular jurors were first sworn, the trial court stated that, although it was its practice to send the alternates home when the deliberations started, it does not dismiss the alternates at that time.

[7] Juror M indicated that she had related some of her feelings of discomfort to her fellow jurors. Although the court and counsel engaged in a colloquy about whether to question the remaining jurors in an effort to ascertain

options. The defendant expressed his opposition to proceeding with a jury of five. The state directed the court's attention to *State* v. *Williams*, 231 Conn. 235, 242–43, 645 A.2d 999 (1994), wherein this court, proceeding under the assumption that the trial court's substitution of an alternate juror for an excused juror after deliberations had begun was a violation of § 54-82h (c), applied a harmless error analysis, and placed the burden on the defendant to demonstrate the harm caused by the violation. The trial court deferred its decision until the next day, and indicated its intent to recall the two alternates, who previously had been sent home, to examine them in order to determine whether they could still sit on the case.

On June 16, 1998, the trial court questioned the two alternates and determined that they were both eligible to deliberate. The clerk then randomly selected the name of one of the alternates. The trial court then entertained argument by counsel on how best to proceed. The defendant objected to seating an alternate after the regular jurors had begun deliberation. He further argued that the trial court should declare a mistrial because the procedure contemplated by the trial court was a violation of § 54-82h (c), and because juror M had tainted the other jurors by sharing with them information about her level of discomfort in continuing to sit on the case. The trial court denied the motion for a mistrial, stating that it did not believe that the other jurors had been influenced improperly by juror M. The trial court further stated that, although it was "concerned that it is basically committing an error by" substituting an alternate juror for a regular juror after deliberations had already begun, it nonetheless determined that this procedure was proper.

whether they had been exposed to juror M's concerns, the trial court took no such action.

The trial court then brought the five remaining original jurors into the courtroom and explained that an alternate juror was being substituted for juror M. The court instructed the jurors that they were required to start their deliberations over again, except for the selection of the foreman. Each juror, by a nod of the head, indicated his or her acquiescence and the jurors then retired to the jury room to begin their deliberations anew. Approximately three hours after the jury had concluded its deliberations and had recessed for a lunch break, the jury reached its verdict, finding the defendant guilty of both crimes as charged.

The state argues, for the first time on appeal, that § 54-82h (c) authorizes the substitution of an alternate juror even after deliberations have begun. In the alternative, the state argues that the violation of § 54-82h (c) is subject to the harmless error doctrine and that the defendant's failure to demonstrate harm requires that we affirm his convictions. The defendant contends that, by substituting an alternate juror for a regular juror after jury deliberations had begun, the trial court violated § 54-82h (c).[8] He next claims that the trial court was required to declare a mistrial. Finally, the defendant contends that this court should reverse his convictions and not engage in a harmless error analysis.

[8] The defendant also asserts that the trial court improperly failed to follow the directive of the Appellate Court in *State* v. *Walton,* 41 Conn. App. 831, 843 n.5, 678 A.2d 986 (1996), to declare a mistrial when, in the middle of deliberations, a juror is excused and the parties do not waive their right to a jury of six. According to the defendant, because *Walton* was decided two years before the trial in the present case, the trial court's failure to follow this binding precedent mandates that we exercise our supervisory authority and order a new trial, i.e., the mistrial that the trial court was required, but refused, to declare. To the extent that the defendant's argument asks us to reject the harmless error analysis that we employed in *State* v. *Williams,* supra, 231 Conn. 244–45, we deem it a request to overrule that case. For the reasons set forth in part II B of this opinion, we agree with the defendant that harmless error analysis is not appropriate, and accordingly, we overrule that part of *Williams.*

In *State* v. *Williams*, supra, 231 Conn. 242, we assumed, but did not decide expressly, that it was a violation of § 54-82h (c) to substitute an alternate juror for a regular juror after deliberations had begun. Thereafter, we concluded that, because the defendant had failed to establish that he had been harmed by the violation, the impropriety was deemed to have been harmless. Id., 245. We agree with the defendant's interpretation of the statute in this case and therefore conclude that the trial court violated § 54-82h (c). We further agree with the defendant's assessment as to the appropriate remedy, that is, that, in the absence of an agreement by the parties to proceed with the remaining five jurors, the trial court was required to declare a mistrial after releasing juror M from her service as a juror. Therefore, we expressly overrule that portion of *Williams* that endorsed a harmless error analysis.[9]

A

Our analysis of this issue is guided by well established legal principles. "Statutory construction is a question of law and therefore our review is plenary." *Davis* v. *Norwich*, 232 Conn. 311, 317, 654 A.2d 1221 (1995).

---

[9] We do not, however, overrule that part of *State* v. *Williams*, supra, 231 Conn. 243–44, wherein we concluded that "the mechanisms for providing for and dismissing alternate jurors, and the circumstances under which they may be substituted for regular jurors . . . does not implicate constitutional rights" and are thus for the legislature to decide. The idea of alternate jurors was unknown at common law and came into existence only as a creation of the legislature in 1939. See General Statutes (Cum. Sup. 1939) § 1406e. Accordingly, we reject the state's contention that an interpretation of § 54-82h (c), requiring a mistrial when a juror has been dismissed during deliberations, is "constitutionally precarious" because it runs afoul of the constitutional doctrine of the separation of powers. See *Heslin* v. *Connecticut Law Clinic of Trantolo & Trantolo*, 190 Conn. 510, 521, 461 A.2d 938 (1983) ("[i]n the context of challenges to statutes whose constitutional infirmity is claimed to flow from impermissible intrusion upon the judicial power, we have refused to find constitutional impropriety in a statute 'simply because it affects the judicial function, so long as it is an exercise of power assigned by the constitution to the legislature' ").

"[O]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . *State* v. *Burns*, 236 Conn. 18, 22–23, 670 A.2d 851 (1996); *State* v. *Spears*, 234 Conn. 78, 86–87, 662 A.2d 80 (1995)." (Internal quotation marks omitted.) *Connecticut National Bank* v. *Giacomi*, 242 Conn. 17, 32, 699 A.2d 101 (1997).

With this background in mind, we turn to the statute at issue. General Statutes § 54-82h (c) provides in relevant part: "Alternate jurors shall attend at all times upon trial of the cause. . . . If, at any time, any juror shall, for any reason, become unable to further perform his duty, the court may excuse him and, if any juror is so excused or dies, the court may order that an alternate juror who is designated by lot to be drawn by the clerk shall become a part of the regular panel and the trial shall then proceed as though such juror had been a member of the regular panel from the time when it was begun. A juror who has been selected to serve as an alternate shall not be segregated from the regular panel except when the case is given to the regular panel for deliberation at which time he shall be dismissed from further service on said case."

The state argues that the plain language of the statute authorizes the trial court to substitute an alternate juror for a member of the original panel "at any time," and therefore, does not preclude it from doing so once deliberations have begun. Consistent with this proposed interpretation, the state also reads the statute's language that the trial court "shall" dismiss alternate jurors once deliberations have begun as merely a directory,

rather than a mandatory, instruction that allows the trial court to recall an alternate juror if need be, after that alternate has been released from service. The state's argument rests on two assumptions: (1) that § 54-82h (c) does not require the trial court to dismiss the alternates upon submission of the case to the jury; and (2) that § 54-82h (c) does not prohibit the mid-deliberation replacement of an original juror with an alternate juror. We do not agree with those assumptions.

"The test to be applied in determining whether a statute is mandatory or directory is whether the pre-scribed mode of action is the essence of the thing to be accomplished, or in other words, whether it relates to a matter of substance or a matter of convenience. . . . If it is a matter of substance, the statutory provi-sion is mandatory. If, however, the legislative provision is designed to secure order, system and dispatch in the proceedings, it is generally held to be directory, especially where the requirement is stated in affirmative terms unaccompanied by negative words. . . . *Doe* v. *Statewide Grievance Committee*, 240 Conn. 671, 680–81, 694 A.2d 1218 (1997)." (Citation omitted; internal quotation marks omitted.) *State* v. *Pare*, 253 Conn. 611, 622–23, 755 A.2d 180 (2000).

Looking first to the words of § 54-82h (c), it would appear that the language requires a trial court to dismiss an alternate juror once deliberations have begun, and thereby prohibits the mid-deliberation replacement of regular panel members. As stated previously, the statute provides that, when the jury begins deliberations, the alternates "shall be dismissed from further service on said case." General Statutes § 54-82h (c). "Definitive words, such as must or shall, ordinarily express legisla-tive mandates of a nondirectory nature. *State* v. *Metz*, 230 Conn. 400, 410, 645 A.2d 965 (1994); *Lo Sacco* v. *Young*, 210 Conn. 503, 507, 555 A.2d 986 (1989) . . . .

We have noted, however, that the use of the word shall, though significant, does not invariably establish a mandatory duty. . . . *Doe* v. *Statewide Grievance Committee*, supra, 240 Conn. 681." (Citation omitted; internal quotation marks omitted.) *State* v. *Pare*, supra, 253 Conn. 623. Therefore, we turn to the other aforementioned considerations in deciding whether § 54-82h (c) imposes a nondiscretionary obligation.

The geneology of § 54-82h (c) supports our interpretation of the statute's language. As originally enacted in 1939, our alternate juror statute, which then applied to both civil and criminal trials, authorized the trial court to replace a regular juror with an alternate if, for any reason, that juror became unable to further perform his or her duties "before the case shall be committed to the jury." See General Statutes (Cum. Sup. 1939) § 1406e. Subsequent statutory revisions retained that same language, thereby specifically prohibiting the mid-deliberation substitution of alternate jurors. See, e.g., General Statutes (1949 Rev.) § 7911.

In 1959, the alternate juror statute, General Statutes § 51-243, allowed the substitution of an alternate if, "at any time," a regular juror became unable to fulfill his or her official duties. The statute also provided that alternates "shall be dismissed when the case is given to the regular panel for deliberations." Thereafter, in 1969, House Bill No. 6809 was introduced in the General Assembly as an amendment to § 51-243 (c) that, inter alia, would have permitted the replacement of regular jurors with alternates after deliberations had begun. The proposal was intended "[t]o prevent the unnecessary retrial of cases . . . thereby saving the state thousands of dollars by eliminating early dismissal of alternate jurors." House Bill No. 6809, statement of purpose. The bill, as later modified, provided in relevant part: "If, *at any time*, any juror shall, for any reason, become unable to further perform his [or her] duty . . .

the court may order that [an] alternate juror . . . shall become a part of the regular panel and the trial *or deliberation* shall then proceed as though such juror had been a member of the regular panel from the time when it was begun, *provided the alternate juror or jurors shall be dismissed at the same time as the regular panel.*" (Emphasis added.) Modified House Bill No. 6809.

The bill was passed by the House of Representatives as drafted, but was amended significantly when it reached the Senate. Like the House of Representatives version of the bill, the Senate version authorized the trial court to dismiss a juror "at any time" if that juror became unable to complete his or her duties, but deleted the very language that expressly would have allowed for the mid-deliberation substitution of alternates. Specifically, the Senate deleted the bill's reference to the continuation of "deliberations" after an alternate had joined the panel, and the dismissal of alternates "at the same time as the regular panel." See 13 S. Proc., Pt. 5, 1969 Sess., p. 2318. Instead, the Senate version authorized the continuation, after an alternate had joined the panel, of "the trial" only, and the dismissal of alternates "once the case is given to the regular panel for deliberation." Id. Only after this amendment was adopted by the Senate was the bill passed by the full General Assembly. See 13 H.R. Proc., Pt. 9, 1969 Sess., pp. 4315–17; see also Public Acts 1969, No. 518. Representative Lawrence J. Merly, the sponsor of the bill in the House of Representatives, described the effect of the Senate amendments as "return[ing] the [original] bill . . . to the existing law of alternate jurors," that is, requiring that alternates be dismissed upon submission of the case to the jury, thereby precluding the mid-deliberation substitution of alternate jurors. 13 H.R. Proc., supra, pp. 4315–16. The rejection by the Senate, and ultimately the full General Assembly,

of those provisions of House Bill No. 6809 that expressly would have permitted the mid-deliberation substitution of alternate jurors under then § 51-243 reflects the legislature's disapproval of that practice. See *Commission on Human Rights & Opportunities* v. *Sullivan Associates*, 250 Conn. 763, 782, 739 A.2d 238 (1999) (legislature's decision not to enact explicit exception to antidiscrimination statute reinforced intent to retain present construction).

In 1980, the legislature severed § 51-243 into two separate provisions. The substitution of alternate jurors in civil trials continued to be governed by § 51-243, whereas the substitution of alternate jurors in criminal trials was governed by § 54-82h (c). See Public Acts 1980, No. 80-313, §§ 41 and 56. The text of § 54-82h (c) mirrored that of § 51-243, as amended in 1969, regarding the substitution during trial of an alternate juror for a juror unable to continue in service, and the dismissal of alternates upon submission of the case for deliberation to the jury. Consistent with § 51-243, therefore, we read the language of § 54-82h (c), as originally drafted, as prohibiting the mid-deliberation substitutions of alternate jurors in criminal trials. See *Cotto* v. *United Technologies Corp.*, 251 Conn. 1, 13, 738 A.2d 623 (1999) (presumption that legislature has created consistent body of law warrants interpretation of statute that conforms with existing statutes).

Our interpretation that, pursuant to § 54-82h (c), alternate jurors cannot be recalled to replace an excused juror once deliberations have begun, allows for a complete reading of the statute that gives meaning to each independent clause. See *Rydingsword* v. *Liberty Mutual Ins. Co.*, 224 Conn. 8, 16, 615 A.2d 1032 (1992) (every word and phrase is presumed to have meaning; statutes not construed to render terms surplusage); *West Haven* v. *Hartford Ins. Co.*, 221 Conn. 149, 157, 602 A.2d 988 (1992) ("we do not interpret some

clauses in a manner that nullifies others, but rather read the statute as a whole and so as to reconcile all parts as far as possible" [internal quotation marks omitted]). "If we construe the words 'at all times' and 'at any time' in [§ 54-82h (c)] to include the period following the submission of the case to the jury for deliberations, we are rendering the clause 'at which time [the alternate] shall be dismissed from further service on said case' meaningless. If, however, we consider the statute as a whole and interpret the words 'at all times' and 'at any time' to mean any time during which an undischarged alternate is still available for substitution because [that alternate] has not been dismissed from further service on the case, then we have reconciled the statute's separate parts and rendered 'a reasonable overall interpretation.' " *State* v. *Walton*, 41 Conn. App. 831, 843, 678 A.2d 986 (1996).

Finally, a recent amendment to § 54-82h (c) supports our conclusion that the statute, as enacted, requires the dismissal of alternates upon submission of the case to the jury, and prohibits the mid-deliberation substitution of alternates. See *Weinberg* v. *ARA Vending, Co.*, 223 Conn. 336, 344–45, 612 A.2d 1203 (1992) ("[w]e have previously considered subsequent enactments in order to illuminate the legislature's intent with respect to a prior legislative action"); see also *Velez* v. *Commissioner of Correction*, 250 Conn. 536, 546, 738 A.2d 604 (1999); *State* v. *McVeigh*, 224 Conn. 593, 621, 620 A.2d 133 (1993); *In re Valerie D.*, 223 Conn. 492, 520–24, 613 A.2d 748 (1992). Number 00-116, § 6, of the 2000 Public Acts, which codified Substitute Senate Bill No. 58, amended § 54-82h (c) to provide in relevant part as follows: "If, at any time, any juror shall, for any reason, become unable to perform the duty of a juror, the court may excuse such juror and . . . the court may order that an alternate juror . . . shall become a part of the regular panel and the trial *or deliberation* shall then

proceed *with appropriate instructions from the court* as though such juror had been a member of the regular panel from the time when *the trial or deliberation began. If the alternate juror becomes a member of the regular panel after deliberations began, the jury shall be instructed by the court that deliberations by the jury shall begin anew.* A juror who has been selected to serve as an alternate shall not be segregated from the regular panel except when the case is given to the regular panel for deliberation at which time *such alternate juror may* be dismissed from further service on said case *or may remain in service under the direction of the court.*" (Emphasis added.) That section of the act, which takes effect October 1, 2000, "gives the court the option in criminal cases to retain alternate jurors once deliberation begins or, as under current law, to dismiss them. It allows alternate jurors to become part of the regular panel of jurors during deliberations as well as during trial as current law provides. If a juror joins during deliberation, the bill requires an appropriate instruction from the court and that the court instructs the jury to begin deliberations again." Fiscal Note and Bill Analysis Report on Substitute Senate Bill No. 58 (February 2000 Sess.).

Public Act 00-116 reflects the legislature's understanding that, as originally enacted, § 54-82h (c) does not allow for the mid-deliberation substitution of jurors. The deliberate substitution of the word "may" for the word "shall," in relation to the dismissal of alternates once deliberations have begun, coupled with the express authorization of substituting alternates after the case is submitted to the regular panel for deliberations, confirms that until P.A. 00-116 takes effect, § 54-82h (c) requires that, upon submission of the case to the jury, the trial court must dismiss the alternate jurors, stripping it of the authority to recall them should a regular juror be excused thereafter.

Our conclusion that § 54-82h (c) does not permit the mid-deliberation substitution of an alternate juror is consistent with our recent holding in *State* v. *Pare*, supra, 253 Conn. 611, wherein we discussed the formal status of a jury in the course of construing the term "discharge" as used in Practice Book § 42-31. In that case, we held that members of a jury are not necessarily relieved of their official obligations after they have departed from the courtroom and therefore, under certain circumstances, may be recalled for the purpose of submitting to a jury poll. Id., 629. In other words, *Pare* stands for the proposition that mere departure from the courtroom does not, in and of itself, discharge a jury from its obligation to render continued service in a particular case. In *Pare*, we went on to discuss when the obligations accompanying jury service are deemed complete, such that a jury is no longer subject to the authority of the court. We concluded that a jury completes its task, and thereby relinquishes its status as a judicial body, upon the separation and dispersal of its individual members. Id., 634. "When a jury remains as an undispersed unit within the control of the court and with no opportunity to mingle with or discuss the case with others, it is undischarged and may be recalled." (Internal quotation marks omitted.) Id., 630, citing *United States* v. *Marinari*, 32 F.3d 1209, 1214 (7th Cir. 1994). After separating and dispersing, however, individual jurors may "come into contact with outside influences"; (internal quotation marks omitted) *State* v. *Pare*, supra, 632–33; thereby tarnishing the deliberations that might take place thereafter. At that point, individual jurors effectively relinquish their status as jurors because they are no longer eligible to be recalled. See id. Similarly, absent some statutory authority to the contrary; see Public Act 00-116; an alternate juror who has been discharged is, simply stated, no longer a juror. Because that individual is no longer subject to the super-

visory authority of the trial court, having been dismissed from service, he or she is susceptible to contact with improper outside influences, and therefore, is no longer capable of serving in an official capacity. See *Cantrell* v. *State*, 265 Ark. 263, 266, 577 S.W.2d 605 (1979) ("[w]hen the jury retire[s] to deliberate, there [is] then no alternate juror"); *Thurman* v. *Commonwealth*, 611 S.W.2d 803, 804 (Ky. App. 1980) (juror ceases to be member of panel upon discharge and thereafter cannot be recalled); *State* v. *Bobo*, 814 S.W.2d 353, 355 (Tenn. 1991) (alternate no longer member of jury because function ceases when case is submitted to regular jury). At that point, the alternate can no longer replace a regular juror who, for whatever reason, has been excused from the case.

In the present case, as dictated by § 54-82h (c), the alternates were discharged by the trial court when the case was given to the regular jury for deliberations. Three days later, the trial court received the letter in which juror M expressed concerns for her safety should she be required to continue her service on the case. After considering the contents of the letter, the trial court determined, upon consent of the parties, that juror M should be excused. The defendant declined to proceed with only five jurors. The court recalled the two alternates, conducted a brief voir dire and concluded that neither had been tainted by outside contacts. Thereafter, the trial court instructed the clerk to select randomly the name of one of the alternates to replace juror M.

As we have stated previously, § 54-82h (c) mandates the dismissal of alternate jurors once deliberations have begun, and thereby prohibits the mid-deliberation substitution of alternate jurors. Thus, the trial court's decision to recall a dismissed alternate to replace juror M was improper.

## B

The remaining question is whether the trial court's violation of § 54-82h (c) is subject to harmless error analysis. We conclude that it is not.

The defendant argues that this court should order a new trial pursuant to its supervisory authority over the administration of justice; see *State* v. *Santiago*, 245 Conn. 301, 332–34, 715 A.2d 1 (1998); because the trial court "deliberately and knowingly" disregarded the Appellate Court's directive in *State* v. *Walton*, supra, 41 Conn. App. 831, that a mistrial must be granted whenever the trial court violates § 54-82h (c). Because the defendant claims that a new trial is necessary whenever § 54-82h (c) has been violated, he in essence requests that we overrule that portion of *State* v. *Williams*, supra, 231 Conn. 235, invoking a harmless error analysis. The state counters that the record fails to support the claim that the trial court intentionally violated § 54-82h (c), and therefore, pursuant to this court's decision in *State* v. *Williams*, supra, 242, the defendant bears the burden of demonstrating the harm of that violation. Finally, the state contends that the defendant has failed to make any showing of harm.

As stated previously, we held in *Williams*, that a violation of § 54-82h (c) was subject to harmless error analysis, and that, because the improper substitution of an alternate juror did not implicate the defendant's constitutional right to a trial by jury, the defendant bore the burden of demonstrating the harmfulness of that substitution. Id., 242. In *Williams*, we did not examine the contours of § 54-82h (c), but, rather, assumed, without deciding, that the mid-deliberation substitution of an alternate violated the statute.

In the present case, we have resolved the question left open by *Williams*, concluding that General Statutes § 54-82h (c) did not permit the mid-deliberation substi-

tution of an alternate. The rationale undergirding that conclusion informs our assessment of whether to continue to review violations of § 54-82h (c) for harmless error. Specifically, having determined that an alternate, discharged from service when the case was submitted for deliberation to the jury, lost her status as a juror, it necessarily follows that the former alternate was no longer qualified to participate in the remainder of the proceedings. In light of the narrow question before us in *Williams*, we did not have occasion to address the legal status of a former alternate, and therefore, the conclusion that we drew therein did not take account of that factor. We are constrained to conclude that the inclusion of a nonjuror among the ultimate arbiters of innocence or guilt necessarily amounts to a "[defect] in the structure of the trial mechanism" that defies harmless error review. *State* v. *Bobo*, supra, 814 S.W.2d 358; see *Thurman* v. *Commonwealth*, supra, 611 S.W.2d 804 (improper recall of discharged juror after start of deliberations warrants retrial).[10]

"We realize the burdens that are imposed on the trial courts when a juror suddenly becomes . . . disqualified from service during the deliberative process, especially where the trial has been lengthy and complex in nature. But however cumbersome the process may be, we do not believe it is appropriate to substitute our judgment as to guilt or innocence for that of the jury, which we must necessarily do in applying the harmless error analysis. It is impossible to say that the remaining [jurors] would be capable of disregarding their prior deliberations, even with an instruction to do so, and become receptive to the alternate's attempt to assert a

---

[10] We do not dispute the contention raised by the dissent, that a jury is presumed, absent evidence to the contrary, to have properly followed the trial court's instructions throughout its deliberations. This contention, however, assumes the existence of a legally constituted jury which, in this case, ceased to exist once the "nonjuror," that is, the former alternate, was recalled to contribute to the deliberative process.

view that might be non-conforming." *State* v. *Bobo*, supra, 814 S.W.2d 358. The inability to assess the effect of this impropriety on the defendant's trial persuades us that reversal must be automatic. To the extent that *State* v. *Williams*, supra, 231 Conn. 242, held otherwise, it is overruled. See footnote 8 of this opinion.

The judgment is reversed and the case is remanded for a new trial.

In this opinion BORDEN, NORCOTT, SULLIVAN and VERTEFEUILLE, Js., concurred.

MCDONALD, C. J., with whom PALMER, J., joins, concurring in part and dissenting in part. I agree with parts I and II A of the majority opinion. I disagree, however, with part II B.

In *State* v. *Williams*, 231 Conn. 235, 244, 679 A.2d 920 (1994), this court assumed, without deciding, that the mid-deliberation substitution of an alternate juror violated General Statutes § 54-82h (c) and then proceeded to employ a harmless error analysis.[1] The majority now overrules this court's holding in *Williams*. "[T]he doctrine of stare decisis counsels that a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it." (Internal quotation marks omitted.) *George* v. *Ericson*, 250 Conn. 312, 318, 736 A.2d 889 (1999). I would conclude that this is not such a case.

The majority states that it is not overruling the holding of *State* v. *Williams*, supra, 231 Conn. 243–44, that

---

[1] The trial court in *State* v. *Williams*, supra, 231 Conn. 240, questioned the alternate juror as to whether he had spoken to anyone about the case, and he responded that he had not. The trial court also questioned the remaining eleven jurors as to whether they would be able to begin deliberations anew. The jurors indicated that they would be able to do so. Id. Because the record indicated that the trial court in *Williams* had attempted to minimize any potential prejudice to the defendant resulting from the substitution of the alternate juror, this court determined that no prejudice had occurred. Id., 245.

"the mechanisms for providing for and dismissing alternate jurors, and the circumstances under which they may be substituted for regular jurors do not implicate constitutional rights." Because, however, " '[i]t is impossible to say that the remaining [jurors] would be capable of disregarding their prior deliberations, even with an instruction to do so, and become receptive to the alternate's attempt to assert a view that might be nonconforming,' " the majority concludes "that reversal must be automatic." In reaching this conclusion, the majority is at odds with this court's precedent. We have held that a jury is presumed to follow the trial court's instructions. See, e.g., *State* v. *Griffin*, 175 Conn. 155, 160, 397 A.2d 89 (1978). In this case, there is no indication that the jury failed to follow the trial court's instructions to begin deliberations anew following the seating of the alternate juror.

The majority's conclusion is also at odds with the wisdom of the United States Court of Appeals for the Second Circuit, whose rulings are binding on federal courts in Connecticut. In *United States* v. *Hillard*, 701 F.2d 1052, 1058 (2d Cir. 1983), that court held that, despite the rule 24 (c) of the Federal Rules of Criminal Procedure,[2] the federal equivalent to § 54-82h (c), the substitution of an alternate juror after deliberations have begun does not lead to reversal per se, absent a showing of prejudice. A great number of other Circuit Courts of Appeal have so held as well. See *United States* v. *Quiroz-Cortez*, 960 F.2d 418, 420 (5th Cir. 1992) (same); *United States* v. *Huntress*, 956 F.2d 1309, 1316 (5th Cir. 1992) (same); *United States* v. *Gambino*, 788

---

[2] In 1998, the year during which the defendant's trial in the present case took place, rule 24 (c) of the Federal Rules of Criminal Procedure provided in relevant part: "Alternate jurors in the order in which they are called shall replace jurors, who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties. . . . An alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict. . . ."

F.2d 938, 948 (3d Cir. 1986) (same); *United States* v. *Josefik*, 753 F.2d 585, 587 (7th Cir. 1985) (same); *United States* v. *Kopituk*, 690 F.2d 1289, 1309 (11th Cir. 1982) (same).

The majority is also at odds with other states that have followed the federal approach of applying a harmless error test to claims of improper substitution of alternate jurors. See, e.g., *People* v. *Henderson*, 45 Ill. App. 3d 798, 805, 359 N.E.2d 909 (1977) (error harmless if no prejudice from late substitution); *State* v. *Williams*, 659 S.W.2d 298, 300 (Mo. App. 1983) (same); *State* v. *Grovenstein*, 335 S.C. 347, 351–52, 517 S.E.2d 216 (1999) (burden on defendant to demonstrate prejudice due to improper jury influence).

Finally, in reaching this conclusion, the majority is at odds with the collective wisdom of the people of Connecticut as embodied by the legislature. Since *State* v. *Williams*, supra, 231 Conn. 235, was decided, the legislature had taken no action in response to our holding that a violation of § 54-82h (c) is subject to harmless error analysis. Although "we are aware that legislative inaction is not necessarily legislative affirmation . . . we also presume that the legislature is aware of [this court's] interpretation of a statute, and that its subsequent nonaction may be understood as a validation of that interpretation." (Citation omitted; internal quotation marks omitted.) *State* v. *Hodge*, 248 Conn. 207, 262–63, 726 A.2d 531, cert. denied, 528 U.S. 969, 120 S. Ct. 409, 145 L. Ed. 2d 319 (1999). The legislature, however, recently amended § 54-82h (c) to permit the trial court to retain alternate jurors and to substitute an alternate juror for a regular juror after deliberations have begun. The very practice that the majority deems to be so prejudicial as to prohibit harmless error review is now permitted by statute.

In this case, the record, as in *Williams*, indicates that the trial court had attempted to minimize any potential

prejudice. The trial court questioned each of the alternate jurors as to whether they had spoken to anyone about the case. Each juror responded in the negative, without hesitation or equivocation. As a result, the trial court deemed them "very credible," concluding that they were "still viable, unbiased and fair jurors . . . ." The trial court also instructed the jurors to "begin the determination and deliberation process from ground zero." I would therefore conclude that, because the defendant has failed to establish that he was prejudiced by the needed substitution of the alternate juror, the defendant's conviction should be sustained.

Accordingly, I respectfully dissent.